Matthew G. McHenry, OSB 043571
Levine & McHenry LLC
1050 SW Sixth Avenue, Suite 1414
Portland, OR 97204
503-546-3927
email: matthew@levinemchenry.com

Amanda Alvarez Thibeault, OSB 132913
Alvarez Thibeault LLC
330 NE Lincoln Street, Suite 100
Hillsboro, OR 97124
503-640-0708
email: amanda@aatlegal.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. 3:22-cr-00084-SI |
| Plaintiff, | ) |
| vs. | ) **DEFENDANT'S RESPONSE TO GOVERNMENT'S OMNIBUS MOTION *IN LIMINE*** |
| TONY DANIEL KLEIN, | ) |
| Defendant. | ) |

Defendant Tony Klein responds to the government's Omnibus Motion *In Limine* (ECF 88) as follows.

## A.     Response to government's motion *in limine* #1

The government moves to exclude evidence that Mr. Klein was "professional, devoted to his job, or dedicated to public service." The defense does not intend to offer general characterizations of Mr. Klein as to those things, and

agrees that general statements that Mr. Klein is a good employee or good person are inadmissible.

Those general concessions aside, the defense does intend to present evidence that on a variety of occasions, Mr. Klein performed examinations and no such claims of sexual assault were reported, in order to rebut the government's extensive attempts to offer other act evidence under FRE 413. These "not me too" witnesses, which the defense is still working on gathering due to the government's continued delay of discovery in this case, is an area this court is familiar with.[1] The defense is entitled to rebut the evidence the government seeks to admit (if this court finds it admissible) with witnesses of its own.

Moreover, prior to 2017 there do not appear to be any written grievances regarding any inappropriate sexual behavior by Mr. Klein. This fact is direct evidence related to the defense theory in this case and is relevant and admissible under FRE 401. Mr. Klein was employed with CCCF since close to a decade prior to the sudden outpouring of grievances of a sexual nature. Although grievances had been filed against him, it was not until approximately 2017, and almost all at once, that the complaints accusing Mr. Klein of sexual abuse came pouring in (as if the witnesses were coordinating with each other to falsely accuse Mr. Klein of sexual abuse for money). The lack of sexual complaints against Mr. Klein, coupled with

---

[1] *Torres et al v. Snider*, 3:17-cv-00624

**2 – DEFENDANT'S RESPONSE TO GOVERNMENT'S OMNIBUS MOTION *IN LIMINE***

the suddenly exponential outpouring of complaints all at once, is logically relevant evidence that supports the defense theory: that persons falsely accused Mr. Klein of sexual abuse and when others learned of the complaints, jumped on the bandwagon to do the same.

This is consistent with what is known about CCCF at the time. In addition to false claims of sexual abuse being a never-ending financial well for inmates, attorneys were also part of creating that culture. For example, in late 2016, civil attorney Leonard Berman was soliciting women as part of the CCCF Facebook page, who could claim to be sexual abuse victims of Dr. Snider, another civilian employee working in medical, as part of a civil suit. It is no coincidence that the public solicitations for clients for a civil suit seeking money are what led to the false accusations in the Snider case.[2] That background, as well as the lack of prior complaints against Mr. Klein for sexual assault, helps illustrate the falsity of complaints against Mr. Klein.

Moreover, excluding evidence like lack of previous grievances against Mr. Klein, other inmates who were examined by Mr. Klein without complaint, and other nurses who never saw Mr. Klein behave inappropriately, for example, allows the government to create a false inference in the jury's mind regarding the culture

---

[2] The verdict in the *Snider* case was a defense verdict, even on the low bar of preponderance of the evidence.

at CCCF and how Mr. Klein was viewed at the time of these accusations. The jury is going to hear how long Mr. Klein was employed at CCCF but they are only going to hear from the government about a narrow window of time during which these complaints are made. The jury will be left to speculate what was happening with Mr. Klein in the years prior, a void the government will certainly try and take advantage of. Moreover, the absence of complaints about Mr. Klein in the years prior to the sudden outpouring of these complaints directly contradicts the government's theory: That Mr. Klein has a pattern of sexual predation that somehow went unchecked by every government employee at ODOC until approximately 2017. Indeed, that is the theory their case relies upon. That theory is not based in reality. Mr. Klein was an employee at CCCF for years prior to a single one of these complaints coming forward. The lack of complaints has a direct logical relevancy under Rule 401 in showing that the sudden outpouring of those complaints stemmed from something other than Mr. Klein's sexual predation, to wit, a desire for money, among other things. Further, such evidence is necessary to rebut the 413 evidence the government intends to offer.

Mr. Klein has a right under the Fifth and Sixth amendments to mount a defense to the charges. Moreover, Mr. Klein has an Eighth Amendment right to confront the accusers against him. Evidence that these complaints arose suddenly and at extraordinary volume in the face of an excellent employee record raises

direct questions about the validity of the present complaints.  Mr. Klein did not

sexually touch these women. Their allegations are false. The constitution requires

that Mr. Klein be able to demonstrate that by objective evidence, as discussed

above.

**B.      Response to government's motion *in limine* #2**

The defense agrees with the government that the chart attached to their

omnibus pleading lists the convictions that may and may not be used *under Rule*

*609*. The defense does not concede that these convictions are not admissible in

other circumstances and under other rules evidence. The defense cannot anticipate

the testimony of the witnesses and it is entirely possible the government's

witnesses will say things that make those convictions admissible under other rules.

Should the Defense believe the door has been opened to the convictions beyond the

10-year rule, the defense will alert the government and the court before offering

that evidence.

**C.      Response to government's Motion *in limine* #3**

The defense agrees with the legal proposition that FRE 403 may limit the

admissibility of certain information related to convictions otherwise admissible

under 609. However, in this case, the nature of AV3's prior convictions as well as

the length of her sentence is admissible under 401 and should not be excluded

under 403. AV3, who has one of the worst disciplinary records of the

government's witnesses, claimed Mr. Klein repeatedly sexually assaulted her in 2017.

Like most of the other accusers, AV3 waited an extensive period of time before reporting those allegations (and did so only after she spoke with other accusers and discussed getting an attorney for the accusations). The government's response to these delays will predictably be that Mr. Klein's accusers were afraid of what would happen to them in the prison if they reported these accusations. In the case of AV3, that is easily rebutted by her extensive disciplinary record (which the defense will address in a separate response). Further, the nature of AV3's criminal history, namely the fact that she was in prison for committing a homicide and trying to commit another, indicates that she is not the type of person to fear that discipline. Given her disciplinary record and the fact that she is the type of person to commit a homicide, the government's expected explanation (that AV3 was so afraid of the response by DOC that she failed to timely report her assault), is patently unsound.

**D.    Response to government's motion _in limine_ #4**

The defense filed its own 404 motion on these issues. ECF 17 at 9–14. The defense agrees that asking about arrests that did not result in criminal convictions for charges that took place prior to the accusations against Mr. Klein should not be admitted. However, as laid out in the defense motion, the defense intends to cross-

examine and include evidence of the witnesses' subsequent criminal charges (regardless of the whether they resulted in convictions), including their flight from law enforcement as the result of those charges.

Although the government contends that "the United States is not involved in those investigations in any way," that does not address the question at hand. It is clear from discovery that the defense continues to receive (a sixth volume of discovery was received as recently as last week) that the witnesses with pending charges believe the government can assist them. AV2, for example, has repeatedly told the government that she is conditioning her testimony against Mr. Klein on the government's assistance with her new pending case. She has told the government via letter that if she is not out of jail on her new pending case (giving the government specific instructions on programs that could get her out of jail) she is going to have trouble remembering the incidents against Mr. Klein.

That the government claims they have not promised anything to these witnesses does not speak to whether the witnesses want or expect to receive any benefit or favor from the government in exchange for their testimony. As discussed in the defense's motion in limine on FRE 404, many of the accusers fled from law enforcement and *if* produced at trial by the government (the mechanics of which continue to remain a mystery to the defense given the government's refusal to turn over *Brady* evidence related to those witnesses), those witnesses will be in custody

at the time. There is no doubt that the pending criminal accusations, heightened by the continued flight from law enforcement, would be things that would motivate a witness to curry favor with the government in order to benefit themselves. Those pending charges give the witnesses a motive to say whatever the government wants to hear. Bias is never collateral. Mr. Klein has a constitutional right to admit evidence that reveals the witnesses' bias. Their pending charges must be admitted.

**E.    Response to government's motion *in limine* #5**

Contrary to the government's assertion, the disciplinary records are relevant and admissible under Rule 401 as they directly contradict the government's own theory of the case. The vast majority of the accusations against Mr. Klein are "delayed disclosures," meaning, accusations that were made several months after they were said to have occurred. To try and explain away the delay in disclosure as anything other than fabrication for a financial gain, the defense expects the government to argue that one reason for the delay in disclosure is because the accusers were afraid of the discipline they might receive as punishment for reporting prison staff abuse.

Indeed, the government intends to call an expert to explain that theory. Specifically, the government intends to offer evidence that incarcerated individuals underreport or delay reporting of abuse due to potential "repercussions" from reporting abuse, and that this concept is "common knowledge to inmates in these

institutions." ECF 45 (Government's Expert Witness Notice). In essence, the government will offer evidence claiming that the general character of female inmates is that they fear the discipline they might face for reporting, and that is why they do not choose to report the abuse.

To the defense's knowledge, Mr. Dumond, the government's expert, was never employed with CCCF. He has not reviewed any of the AV's disciplinary files or their statements, nor is he aware of any of the particulars of CCCF. The government's hope is that by generally stating that many women are afraid to report sexual abuse in prison due to disciplinary repercussions, the jury will infer that these particular witnesses must also have been afraid to report for similar reasons.

The problem with the government's theory is that the disciplinary records of most of these AV's plainly illustrate that they were not afraid of any disciplinary repercussions. Knowing that the specific circumstances do not align with the general assumptions the government hopes the jury will make, the government moves to exclude that evidence. Additionally, the Defense expects the government will inquire of its witnesses as to why they delayed reporting the accusations, and further expects many of the witnesses to testify that they were afraid of the disciplinary results that could have occurred for such a reporting.

The defense must be allowed to rebut both of those assumptions by showing that, in fact, most of these AV's were not afraid of the repercussions of prison discipline. In order to rebut this, the defense must be allowed to offer: (a) the frequency with which the AVs engaged in behavior that subjected them to discipline and segregation (for the purposes of rebutting the government's position that delayed disclosures were delayed out of fear of discipline); (b) the nature of the behavior that caused the inmate to be disciplined (the flagrancy of which rebuts the government's assertion that the inmates were afraid to report staff behavior or somehow afraid of staff or discipline); and (c) the length and intensity of sanctions received by the inmates (again to rebut the government's explanation for delayed disclosures).

For example, AV7 was not afraid of being put in segregation when, according to ODOC records, she "used the Department of Corrections phone system to conduct illegal/illicit activities to conduct acts of crime for financial gain," while incarcerated. AV7 was obviously not afraid of discipline or negative staff responses when in 2014 she approached a fellow inmate and punched her several times in the back of the head, resulting charges of Inmate Assault II. She was not afraid of retribution from ODOC staff when she conspired with other inmates to distribute dangerous drug-filled syringes throughout the facility in 2014, either. AV7 was not afraid of discipline or segregation when she admitted she was

intoxicated when she was first interviewed in custody about the accusations against Mr. Klein.[3] The list goes on.

Similarly, AV3 was not afraid of the consequences of her actions when she was found to have forcibly sexually abused another inmate in 2018. This disciplinary record is of particular importance to Mr. Klein's case given the government's expected argument that delayed reporting is because these types of accusations are uncomfortable to deal with in prison. AV3 certainly showed no discomfort when she sexually assaulted another inmate, amplifying the broad strokes the government wants to use in an attempt to fix its case. AV3 likewise did not appear concerned about the consequences when she was found to have alcohol hidden in her cell in January 2018. Again, like with AV7, the list of disciplinary behaviors is extensive.

If the government intends to attempt to explain away the delayed disclosures by arguing that the accusers were afraid of what could happen to them in terms of prison discipline, the defense is entitled to rebut that evidence by showing all the other times these accusers engaged in behavior that actually resulted in discipline as well as the disciplinary punishments that they received.

---

[3] Notably, this information was revealed during an interview AV7 had with government agents on April 6, 2023. Though clearly *Brady* material, with trial set a mere three months away, the government inexplicably waited until May 1, 2023, nearly a month—one third of the remaining trial preparation period—to provide this discovery to the defense.

The government is trying to put Mr. Klein in prison for the rest of his life. Mr. Klein has a constitutional right to put on a defense in response. The government could choose to pursue a different theory. The government could choose not to argue or offer evidence that the delayed disclosures were based on fear of staff retribution. They have chosen to do so, and as such the defense is entitled to rebut their evidence. The government has chosen to elicit expert testimony about the basis for the delayed disclosures. The disciplinary records for the accusers in this case are replete with examples that directly cut against the government's own evidence. They are admissible as necessary to rebut the government's claims regarding the reasons for delayed disclosure.

Refusal to admit disciplinary records that contradict the government's theory of the case creates a vacuum that would mislead the jury and cause them to speculate. If the government offers evidence that delayed disclosures occur due to fear of prison discipline if disclosed in a timely manner, the jury must be allowed to know that most of the accusers, in fact, regularly engaged in behavior that demonstrated the opposite.

## F.    Response to government's motion *in limine* #6

The defense generally agrees that evidence of a victim's "sexual predisposition" would be largely inadmissible under 401 and 412. However, as discussed in *supra* Part E, evidence that any of the AV's engaged in sexual assaults

while in prison, like AV3, is required to be admitted by the Federal constitution for the reasons discussed above.

Additionally, on May 9, 2023, the defense received thousands of pages of records from ODOC pursuant to its subpoenas. Those documents relate to other PREA investigations in the prison. The defense is examining those records as quickly as possible while also trying to meet the pretrial pleading deadlines this court has established. There may be other claims of sexual abuse made by the same inmates in this case against other staff. If those exist, the defense will seek to offer those via motion at a later date.

## G.    Response to government's motion *in limine* #7

As a general proposition, the defense will follow the Federal Rules of Evidence as well as abide by any order this court imposes on the admission or restriction of evidence. This same proposition applies to the use of the witnesses' medical records. The defense will not, however, provide the government a preview of its theory of defense in advance, under the guise that the use of medical records requires such a thing. It does not.

Rule 401 limits the world of evidence to that which is relevant. The defense cannot anticipate exactly what the government's witnesses will say. It is possible that the defense will not seek to discuss any medical conditions of any of the witnesses. It is just as possible that, upon hearing their direct testimony, many of

the medical records in defense's possession will become relevant. For example, the defense intends to use the medical records in its possession to establish that on many occasions, the records show the defendant did not have access to the AV's when they claimed he did. Likewise, defendant intends to use the records to show that the treatment provided by the defendant was contrary to the witnesses' statements about what happened. The records are therefore relevant to establish that the charged conduct did not occur, and the government's witnesses are lying. In addition, the defense understands that the government intends to use medical records to attempt to prove portions of its case. It is unclear what evidentiary rule the government relies on for the proposition that it gets to use the medical records without advance notice but the defense does not.

The records have other bases for admission as well. For example, if the medical records show that a particular AV has memory issues, that would be relevant under 401 as evidence regarding the veracity of an AV's memory. If an AV is, for example, taking anti-psychotic medication and suffers from hallucinations, that would also be relevant under 401 regarding the quality of their memory and testimony. Lastly, if an AV lies on the stand and claims she does or does not have certain medical issues or makes other claims that are not supported in the records, the defense would be entitled to impeach her with those records.

If the government believes the defense is offering evidence that is inadmissible at trial, the government can object. If the government identifies specific documents it would object to, the defense may respond accordingly. The defense will follow the rules of evidence and any other orders imposed by this court.

**H.     Response to government's motion *in limine* #8**

In its motion to exclude several exhibits the defendant is proffering related to training materials by ODOC, the government misunderstands the purpose for which those are being offered and their relevancy. For context, those training records include slides like the following:



The purpose of those training records is not to establish Mr. Klein's mental state. Rather, the purpose of those training records is to establish the clear fact that false accusations by inmates are so prominent in the Oregon Department of Corrections that ODOC staff receives extensive training on the subject. This is

relevant evidence under FRE 401 and directly responsive to the government's own expert testimony.

The government is seeking to offer generalized assumptions about a prison via an expert who was never employed at CCCF. The government is hoping that those generalized assumptions will allow the jury to assume that the culture described by Mr. Dumond is the culture that permeated CCCF. These training materials show that it was not. As repeated *ad nauseum* throughout this litigation, the government cannot have it both ways. If the government seeks to offer testimony that asks the jury to speculate about the general culture that existed at CCCF for its prosecution, Mr. Klein is constitutionally entitled to offer evidence to the contrary and the jury is entitled to hear an accurate picture of life at CCCF, not just the one the government is trying to paint.

## I.    Response to government's motion *in limine* #9

Defendant objects to this motion. The government's motion seeks to exclude both the initial demand from the civil suit as well as the actual amount received. The government concedes that it is well established that pecuniary interest may be used to show bias, but claims because the lawsuits were filed prior to Mr. Klein's criminal trial, that the pecuniary interest to accuse Mr. Klein no longer exists.

The government's claim that a pecuniary interest no longer exists is perplexing. The government surely understands that if a witness who previously

profited by accusing Mr. Klein in a civil suit testified on the stand during this trial that no such abuse happened, Mr. Klein and his counsel would have every legal right to seek a judgment against the AVs for their false accusations, including seeking to recoup the money they received, which was extensive and, in some cases, totaled hundreds of thousands of dollars. Further, the defense assumes the government knows that if the AV's civil suit was based on false statements in a declaration or deposition, that they could be charged with perjury, and would risk losing their settlement that way, as well. Although the civil suits have resolved, the desire to protect a settlement of that amount certainly still remains, especially if (as the defense contends) that financial settlement was based on lies. The amount the AVs received is therefore entirely relevant under FRE 401 and necessary for Mr. Klein's defense.

Further, the amount the AVs sought in their lawsuit is also relevant under 401. Almost all of the accusations against Mr. Klein were delayed disclosures. The defense theory is that they were made up in an attempt to obtain money from the Department of Corrections. The jury needs to understand how much money was on the line to understand why they would make up these accusations.

A critical question in any case involving sexual abuse is *why* a person would make false accusations. Subsequent questions in this case will require the jury to examine why a person would make false accusations in the prison setting as well

as why they would continue to make them at trial. The amount in question, both received and sought after, directly answers that question: Because they were seeking and want to maintain settlements of thousands of dollars.

The cases cited by the government establish this. The witnesses here do stand "to gain more from a conviction than an acquittal," *United States v. Dees*, 34 F.3d 838 (9th Cir. 1994), because a conviction for Mr. Klein is dependent on the witnesses repeating the same statements they previously made when they were seeking financial gain. Although the witnesses' finances are not predicated on whether or not Mr. Klein is convicted, they are predicated on the witnesses repeating the same false accusations against Mr. Klein, and that is why the financial settlements are relevant.

For all of the AVs who have sought and received financial settlements, it would be nearly impossible for them to now change their testimony and admit they made up the accusations against Mr. Klein. Doing so would risk losing their significant financial rewards. They could be sued civilly, stripped of the previous awards, and also prosecuted criminally and ordered to pay back the amount as restitution. The amounts in question help explain why a witness would continue to lie about Mr. Klein, which goes directly to the heart of the defense case.

As discussed in Defendant's Trial Brief, cross-examination is the "the greatest legal engine ever invented for the discovery of truth." *Winzer v. Hall*, 494

F.3d 1192, 1197 (9th Cir. 2007) (quoting *Lilly v. Virginia*, 527 U.S. 116, 124 (1999)). Consequently, the Court must give broad latitude to the defense attorney to cross examine adverse witnesses.

## J.    Response to government's motion *in limine* #10

As discussed *supra*, the defense will follow the rules of evidence. There is a myriad of hearsay exceptions for many of Mr. Klein's statements, depending on the testimony of the government's witnesses. Trial has not yet happened. The defense does not know, nor is obligated to provide, the various permutations through which some of Mr. Klein's statements located in nearly 100,000 pages of discovery (like the ones where he is seeking more security at CCCF to protect staff against false accusations) may become admissible. The admissibility of individual statements will be dependent on the government's witnesses, the argument the government makes and whether Mr. Klein chooses to testify. If the defense intends to admit some of Mr. Klein's statements at trial, it will properly raise the issue, give the government an opportunity to object, and will abide by the ruling of the Court.[4]

In any event, the government's argument that all of Mr. Klein's statements are hearsay is easily disproven. Most of the emails referenced to ODOC officials

---

[4] As a courtesy to the government, the defense affirms that it does not intend to offer the statements through the testimony of Ms. Alleyne.

also contain requests wherein Mr. Klein is asking for additional security measures. Those requests, by and of themselves, are clearly not for the truth of the matter asserted. Indeed, they are not even assertions under FRE 801(a) (defining hearsay as an assertion), but rather questions. The mere fact that Mr. Klein asked for additional security measures is not a statement made for the truth of the matter asserted; it is an independent act that shows that he was seeking out additional security measures at the time these accusations were taking place.

The government has given the defense nearly 100,000 pages in discovery containing a multitude of statements by Mr. Klein. There are an unlimited number of permutations throughout trial through which some may become relevant and admissible while others not at all. The defense is not required to expend its energy addressing all of those permutations. If the government seeks to exclude specific statements from Mr. Klein, it can make that known and the parties can litigate the issue in advance of trial. Instead, the government's motion seeks to broadly exclude under all circumstances any statements of Mr. Klein prior to the trial even beginning. Ruling on this motion should be deferred until the issue becomes ripe at trial.

## K.    Response to government's motions *in limine* #11 and #12

Defense and the government both agree on the controlling universe of law that applies to their respective experts. The defense requested a *Daubert* hearing

for the government's expert based on the same universe of law, and requests that

this motion be deferred until a *Daubert* hearing is held. The defense will note prior

to that hearing, however, that the complaints the government makes about the

defense's proposed expert witness are equally applicable to their own proffered

expert, based on the government's own language. For example, the government

states:

> At the level of generality in the defendant's notice and supplement,
> ECF Nos. 59 and 67, it is difficult to parse Ms. Alleyne's opinions,
> the bases for them, and how, specifically, they will be helpful to a
> jury, beyond merely offering a credibility assessment of the victims.
> The defendant explains, "Ms. Alleyne's testimony will give necessary
> context to the testimony of the witnesses, as she will explain the
> unique circumstances that arise in a custodial setting that can
> contribute to false allegations being made against staff." To the extent
> this testimony amounts to a credibility assessment of people who are
> incarcerated, it is improper and should be excluded; no expert can
> properly opine about whether another witness is credible. *United
> States v. Sine*, 493 F.3d 1021, 1040 (9th Cir. 2007).

ECF 88.

A close reading of the defense's expert notice and the government's expert

notice reveal that the respective experts appear to be testifying about the same

Despite that claim, the government's own expert notice contains nearly the

same language in summarizing their own expert's usefulness: "Mr. Dumond's

testimony will give necessary context to the testimony of the victims, as he will

explain the unique circumstances, vis-à-vis sexual assault, that arise in a custodial

setting, as compared to in the greater community." ECF 45.

A close reading of the defense's expert notice and the government's expert

notice reveal that the respective experts appear to be testifying about the same

general universe of materials, only from different experiences. The type of expert

testimony the government intends to offer is of the same type of the defense

intends to offer. The government intends to offer the testimony of Mr. Dumond for

precisely the same reason it claims the defense's expert testimony is inadmissible:

to offer a general credibility assessment of people who are incarcerated. To the

extent that the government argues this renders the defense's expert testimony

inadmissible, such a ruling would render their own proffered testimony

inadmissible as well.

**L.     Response to government's motion *in limine* #13**

The defense objects to this motion. The witness associated with this motion,

(hereinafter "CW" for "complaining witness") was one of the first inmates to

accuse Mr. Klein of sexual abuse. During the course of the investigation, CW

bragged to many of the other accusers in this case about her plan to extort money

from the Department of Corrections. As part of her plan, she tried submitted a pair

of her underwear to the investigation as proof of her claims. The DNA results did

not support her claim.

The evidence regarding CW and the DNA is relevant under 401 for multiple

reasons. First, it helps establish that other women were making claims against Mr.

Klein that the government chose not to pursue. The obvious implication from the

government's choice not to pursue those allegations is because they did not find

them credible based on the investigation performed. Further, CW's back story establishes that there were inmates attempting to extort DOC for money by accusing Mr. Klein near the time all of these accusations began.

The latter is an important part because it rebuts evidence the government is choosing to admit. The government intends to call Mr. Dumond to try and establish that accusations of sexual abuse are underreported, and in so doing will invite the jury to speculate that those conditions existed at CCCF. The defense should be entitled to rebut that assumption by showing that in this circumstance that was not the case.

Additionally, the investigation into CW and the DNA is also relevant under Rule 401 to show that the government has not met their burden of proof with regard to establishing the allegations. When it investigated CW, the government knew the type of evidence that was important to gather, like DNA. No such evidence will be presented to this jury regarding the present accusations against Mr. Klein. Evidence showing that the government failed entirely when it actually did try to gather objective evidence against Mr. Klein provides corroboration that the accusations against Mr. Klein are false and gives the jury an explanation for why the government gave up on gathering any objective evidence to support the present accusations: to wit, their case appears stronger without objective evidence.

**M.      Response to government's motion *in limine* #14**

Defendant objects to the government's motion in part. Notably, this motion

contradicts the government's position in previous motions, where it indicates that it

will move to admit this type of evidence. For example, the government's expert

notice (ECF 45), indicates that Ms. Sage, a government witness, may elicit

testimony that "after the defendant no longer worked at the facility, ODOC

implemented some changes, such as replacing certain doors in the medical unit to

add a window or increasing the size of the existing window[.]" ECF 45 at 6.

Moreover, in its response to the defense's Motion to Continue, the

government wrote "the government interviewed another witness (not identified

above), on February 28, 2023, who explained the changes made to the facility. . . .

[T]his witness described changes including adding windows to certain doors or

rooms, increasing the size of windows, adding security mirrors, shortening the

privacy curtains in the medical unit, and removing blinds or other curtains." *Id.* at

5.[5]

---

[5] The government misled the Court and the defense about this witness. The witness did not actually work at CCCF during the time the accusations against Mr. Klein were said to have occurred, and therefore can provide no relevant information regarding the changes to the facility from the relevant time until the present. Moreover, the witness affirmatively told the interviewing government agent that they questioned their memory regarding the changes made. In essence, the witness did not provide any of the information the government said the witness provided when it invoked that witness's statements as a basis for objecting to the defense's motion to continue.

The defense does not understand the government's objection to the evidence it has told the Court it intends to admit. To the extent the government is seeking an order barring the parties from arguing that the physical changes to the facility post-accusation made it more or less likely that the accusations actually occurred, the defense agrees. Under FRE 407, the government should not be able to argue that the changes to the facility made after the accusations make it more likely that the assaults occurred. Similarly, the defense should not be permitted to argue that the changes made after the accusations make it less likely that the assaults occurred.

However, it does not follow that the defense is prohibited from offering extensive evidence about CCCF's facility management and what its operations protocols were during the time of the accusations. The evidence is relevant under Rule 401 because it helps illustrate to the jury why these accusations, both in their nature and their volume, were in many cases nearly physically impossible to have occurred undetected. The defense will ask witnesses whether the photos and videos it presents to the jury contain any changes from the time the accusations were made because it wishes to present accurate evidence to the jury.

Additionally, the defense objects to the government's motion that would bar the defense from arguing about defects in the facility design. To the extent that the government is arguing that the defense should not be allowed to argue that later changes to the facility indicate there was a previous defect in the facility, the

defense agrees. Indeed, it is obvious that there were blatant defects in the facility at the time of the accusations that facilitated false accusations against staff members. The defense will not need to reference the later changes to the facility to establish this.

Rule 407 does not bar the defense from arguing that the facility, as it existed at the time, was a hotbed for false accusations. That rule simply bars arguing that the later changes support that claim. Mr. Klein is allowed to show the jury the conditions in the prison that existed at the time, discuss with witnesses the security measures and policies in place at the time, and make arguments about what those security policies and procedures meant. Some evidence in Mr. Klein's case will be devoted to answering the "why" question—that is, why would these women falsely accuse Mr. Klein. Other evidence about the facilities as they existed back then, including security measures, housing arrangements, etc., will answer the "how" question—that is, how it was possible to make up accusations and have no objective evidence later available to determine their truth or falsity.

Rule 407 does not allow the government to withhold relevant evidence from the jury about the quality of ODOC's protection of its employees during the time the accusations were made. Rule 407 applies to arguments made about subsequent remedial measures. It does not bar evidence about the conditions of the prison

(lack of chaperones, lack of cameras, lack of reporting policies, lack of inmate tracking, etc.) that existed at the time the accusations were made.

**N.      Response to government's motion *in limine* #15**

The defense agrees with the general legal proposition that the trial court has wide discretion in excluding testimony and evidence regarding the non-prosecution or internal-investigation findings, even if relevant. The defense also generally agrees that evidence of a prior non-complaint or acquittal is usually not relevant under 401, except where it operates to collaterally estop a verdict or proceeding.

In Mr. Klein's case, however, evidence of the "unsubstantiated" findings by ODOC investigators, as well as the no-complaints from the Washington County District Attorney's office are relevant and admissible under FRE 401 and FRE 403 for the following purposes.

The no-complaints as well as the findings by the ODOC are relevant in explaining the large time gap between the time the reports were first made (2017) and the date of the indictment (2022), and necessary to prevent the government from arguing that the gap was related to poor investigations done by ODOC.

The government also intends to offer evidence of the prior investigation into Mr. Klein by ODOC, and intends to offer expert testimony through Mr. Dumond about his general perception of investigations into sexual abuse at prison.  That expert testimony purports to include testimony about "what institutions are

required to do with reports" of sexual abuse as well as "a prison culture that discourages reporting, and the threats of repercussions from staff and inmates alike." ECF 45 at 3–4.

It is apparent from the government's expert witness notice that it hopes the jury will assume that CCCF behaved in the same manner, and use that as an explanation for why it took so long for the inmates to report their behavior and for the government to start their investigation. The government's theory has to be that CCCF was so incompetent that it somehow missed that 27 women were sexually abused by the same nurse in the same short window of time with no staff members noticing. There is no other explanation the government can proffer for CCCF letting that abuse occur unchecked, other than CCCF's internal incompetency.

That explanation, however, is not accurate. CCCF and its officials actively investigated the complaints in a timely manner. They performed the tasks necessary and appropriate under their PREA guidelines. They did all the things they were expected to do and at the end of the investigation they found the allegations unsubstantiated. The Washington County District Attorney's office agreed. To allow the government to argue that the investigations were flawed or part of a "prison culture that discourages reporting," and use the gap in time from complaint to date of indictment as evidence of that would be misleading. Therefore, the evidence is relevant under Rule 401 to rebut the evidence the

government seeks to admit. Without the evidence, the government can paint a misleading picture about the timeline. It did not take five years to get this case to trial because CCCF was incompetent. It took five years to get it to trial because the Federal Government did not like the answers it received from CCCF and the Washington County DA's office.

Likewise, the no-complaints and the internal investigations clearing Mr. Klein's name are also relevant under Rule 401 and not excludable under Rule 403 to show the bias of the government agents that took over this case. The agents knew that Mr. Klein had been investigated by not one but two different law enforcement agencies. The agents investigating Mr. Klein for a third time were motivated not for the truth of the investigation but to get a different answer than they had received previously. The no-complaints and the internal investigations were highly publicized, and it was made known in the publicity that a federal investigation was ongoing.[6] The no-complaints and the prior internal findings made it clear that the last chance to prosecute Mr. Klein was a federal case. Given the media scrutiny and the prior findings by the Washington County District Attorney and CCCF, the investigators on Mr. Klein's case were highly motivated to turn any evidence into evidence that leaned their way, and not Mr. Klein's. The

---

[6] *See, e.g.,* Conrad Wilson, *Questions Hang Over Sexual Assault Claims Involving Former Nurse in Oregon Women's Prison,* OREGON PUBLIC BROADCASTING, March 7, 2022, https://www.opb.org/article/2022/03/08/sexual-assault-claimes-oregon-womens-prison-coffee-creek/ (last visited May 11, 2023).

**29 – DEFENDANT'S RESPONSE TO GOVERNMENT'S OMNIBUS MOTION *IN LIMINE***

resulting bias of the investigators is relevant under Rule 401 and not inadmissible under Rule 403.

## O.    Response to government's motion *in limine* #16

As a general matter, the defense does not object and agrees that arguments for "jury nullification" as it is commonly understood and described in the government's motion are impermissible. The defense agrees that argument or evidence that "defendant has already suffered enough consequences" and evidence or argument "concerning the penalties or punishment that the defendant could face if a jury convicts him" are inadmissible and impermissible.

The defense objects, however, to the exclusion of evidence that CCCF is a poorly run institution, both on the grounds that how CCCF was run (whether good or bad) is highly relevant under Rule 401 and also because such evidence has nothing to do with jury nullification.

Mr. Klein's defense in this case is that he did not sexually touch any of his accusers. They made false accusations against Mr. Klein for a variety of reasons, largely financial. ODOC had a long history of providing payouts for claims of sexual abuse suits, which the accusers knew about. The central question in the jury's mind in evaluating all of the evidence will be why these accusers would falsely implicate Mr. Klein and whether their accusations are credible based on any objective supporting or contradictory evidence.

The conditions at CCCF speak directly to the latter. For example, staffing levels on any given day make it more or less likely that sexual abuse would have been discovered if it actually happened. Similarly, whether or not inmate movement in the facility was adequately tracked makes it more or less likely that these accusations were discoverable. Lastly, the fact that Mr. Klein was *repeatedly* asking for more supervision and support has nothing to do with whether or not he felt "unsupported." A person who is sexually abusing dozens of women does not request more supervision, more surveillance cameras, and more inmate tracking. Mr. Klein requested all of those things and the very fact that he requested that makes it less likely he was committing these assaults.

**P.      Response to government's motion *in limine* #17**

Defense does not object to this motion, and requests the same privilege be provided to the defense and its investigators.

Respectfully Submitted this 12th day of May, 2023:


/s/ *Matthew G. McHenry*                    /s/ *Amanda Alvarez Thibeault*
Matthew G. McHenry                          Amanda Alvarez Thibeault
Counsel for Tony Klein                      Counsel for Tony Klein