## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:22-cr-84-SI |
| v. | **OPINION AND ORDER ON POST-TRIAL MOTIONS** |
| **TONY DANIEL KLEIN**, | |
| Defendant. | |

Natalie K. Wight, United States Attorney, Gavin W. Bruce and Hannah Horsley, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 405 East 8th Avenue, Suite 2400, Eugene, OR 97401; and Cameron A. Bell, Trial Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Civil Rights Division, 950 Pennsylvania Avenue, NW, Washington, DC 20530. Of Attorneys for United States of America.

Matthew G. McHenry, LEVINE & MCHENRY LLC, 1050 SW Sixth Avenue, Suite 1414, Portland, OR 97204; and Amanda A. Thibeault, ANGELI LAW GROUP LLC, 121 SW Morrison Street, Suite 400, Portland, OR 97204. Of Attorneys for Defendant Tony Daniel Klein.

**Michael H. Simon, District Judge.**

On July 25, 2023, after a 12-day trial that included three days of deliberations, a jury convicted Defendant Tony Klein of 17 counts of deprivation of rights under color of law, in violation of 18 U.S.C. § 242. These counts were based on Defendant's alleged sexual misconduct while employed as a corrections nurse with the Coffee Creek Correctional Facility (CCCF), the only women's prison in the state of Oregon. The jury also found Defendant guilty of four counts

of making false declarations in a proceeding before or ancillary to a court of the United States, in violation of 18 U.S.C. § 1623. These counts were based on Defendant's testimony at a deposition ancillary to a civil lawsuit related to his alleged sexual misconduct then pending in the United States District Court for the District of Oregon. The jury acquitted Defendant of two counts under § 242.

Defendant has filed a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure and a separate motion for new trial based on newly discovered evidence under Rule 33. The government opposes both motions. The Court has considered Defendant's motions, the government's opposition, and Defendant's reply. The Court does not believe that oral argument will be helpful in resolving these motions. For the reasons stated below, the Court DENIES Defendant's motions for judgment of acquittal and new trial.

**STANDARDS**

**A.  Judgment of Acquittal**

Rule 29 of the Federal Rules of Criminal Procedure provides, in relevant part: "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). When considering whether evidence is enough to sustain a verdict in a criminal case, the Court must view the evidence in the light most favorable to the prosecution. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (asking whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (cleaned up)); *accord United States v. Grovo*, 826 F.3d 1207, 1213-14 (9th Cir. 2016).

Under this standard, "it is not the district court's function to determine witness credibility" or otherwise substitute its evaluation of the evidence for the jury's. *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002). "In ruling on a Rule 29(c) motion, a district

court must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977), *supplemented on other grounds*, 574 F.2d 476 (9th Cir. 1978) (quotation marks omitted). To defeat a Rule 29 motion, "the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence or rule out every hypothesis except that of guilty beyond a reasonable doubt." *Nevils*, 598 F.3d at 1164 (quotation marks omitted). All conflicting evidence is to be resolved in favor of the jury verdict. *United States v. Corona-Verbera*, 509 F.3d 1105, 1117 (9th Cir. 2007).

## B. New Trial

Rule 33 of the Federal Rules of Criminal Procedure provides, in relevant part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial "should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *United States v. Showalter*, 569 F.3d 1150, 1157 (9th Cir. 2009) (quoting *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981)). A district court "enjoys broad discretion with regard to a new trial motion" because it is "most familiar with the context of the trial." *Freund v. Nycomed Amersham*, 347 F.3d 752, 765 (9th Cir. 2003). Defendants also bear a "heavy burden" in meeting the requirements to establish that a new trial is warranted. *See, e.g.*, *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006) (quoting *United States v. Saada*, 212 F.3d 210, 216 (3d Cir. 2000)). Finally, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded" as harmless error. Fed. R. Crim. P. 52(a).

There is a five-prong test for a motion for new trial based on newly discovered evidence.

> To prevail on a Rule 33 motion for a new trial based on newly
> discovered evidence, a defendant must satisfy a five-part test:
> (1) the evidence must be newly discovered; (2) the failure to
> discover the evidence sooner must not be the result of a lack of
> diligence on the defendant's part; (3) the evidence must be material
> to the issues at trial; (4) the evidence must be neither cumulative
> nor merely impeaching; and (5) the evidence must indicate that a
> new trial would probably result in acquittal.

*United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). "This five-prong test is difficult

to meet." *United States v. Steel*, 759 F.2d 706, 713 (9th Cir. 1985).

**C.  Selected Federal Rules of Evidence**

**1.  Rule 403**

Rule 403 of the Federal Rules of Evidence provides:

> The court may exclude relevant evidence if its probative value is
> substantially outweighed by a danger of one or more of the
> following: unfair prejudice, confusing the issues, misleading the
> jury, undue delay, wasting time, or needlessly presenting
> cumulative evidence.

Fed. R. Evid. 403. The Ninth Circuit has emphasized that, particularly when the disputed

evidence is "inflammatory," "reprehensible," or "abhorrent," "a district court making a Rule 403

decision must know precisely what is in the [evidence] in order for its weighing discretion to be

properly exercised and entitled to deference on appeal." *United States v. Curtin*, 489 F.3d 935,

957 (9th Cir. 2007) (en banc).

**2.  Rule 404**

Rule 404(a) of the Federal Rules of Evidence generally prohibits evidence of a person's

character or character trait "to prove that on a particular occasion the person acted in accordance

with the character or trait." Fed. R. Evid. 404(a). This evidence is sometimes called "propensity

evidence." Rule 404(b)(1) prohibits evidence of a crime, wrong, or other act, "to prove a

person's character in order to show that on a particular occasion the person acted in accordance

with the character." Fed. R. Evid. 404(b)(1). Rule 404(b)(2), however, provides that evidence of

a crime, wrong, or other act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

In the Ninth Circuit, courts "employ a four-part test to determine the admissibility of Rule 404(b) evidence":

> Such evidence may be admitted if: (1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that [person] committed the other act; and (4) (in certain cases) the act is similar to the offense charged.

*United States v. Ramos-Atondo*, 732 F.3d 1113, 1123 (9th Cir. 2013) (quoting *United States v. Bailey*, 696 F.3d 794, 799 (9th Cir. 2012)). Relatedly, a leading treatise explains that a court must decide whether:

(1)      the other acts are offered for a proper purpose;

(2)      the evidence is relevant in light of that purpose;

(3)      the probative value of the evidence is substantially outweighed by the risk of unfair prejudice, so that the evidence should be excluded under Rule 403; and

(4)      a limiting instruction should be given, if requested by the party against whom the evidence is offered.

*See* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Fed. Evid.* § 4:29 at 743 (4th ed. 2013) (citing *Huddleston v. United States*, 485. U.S. 681 (1988)).

The admission of extrinsic evidence under Rule 404(b) for "motive" does not include evidence supporting a motive to lie in testimony. "Although Rule 404(b) does allow evidence of 'other crimes, wrongs, or acts . . . as proof of motive . . . ,' the word 'motive' as used in the rule does not refer to a motive to testify falsely." *United States v. Farmer*, 923 F.2d 1557, 1567 (11th Cir. 1991); *see also United States v. Sampol*, 636 F.2d 621, 659 n.24 (D.C. Cir. 1980) ("The witness's motive to testify falsely, however, is merely an aspect of credibility. The principles

controlling the admission of evidence of conduct probative of credibility are set forth in

Rule 608.").

### 3. Rule 412

Rule 412 of the Federal Rules of evidence provides in relevant part:

> **Prohibited Uses**. The following evidence is not admissible in a
> civil or criminal proceeding involving alleged sexual misconduct:
>
> (1) evidence offered to prove that a victim engaged in other sexual
> behavior; or
>
> (2) evidence offered to prove a victim's sexual predisposition.

Fed. R. Evid. 412 (emphasis in original). The Ninth Circuit, discussing this rule and the Advisory

Committee Notes, has explained:

> Rule 412 forbids the admission of evidence of an alleged victim's
> "sexual behavior" or "sexual predisposition" in all "civil or
> criminal proceeding[s] involving alleged sexual misconduct"
> except under limited circumstances. Fed. R. Evid. 412(a).
> Significantly, the Advisory Committee Notes state that "the word
> 'behavior' should be construed to include activities of the mind,
> such as fantasies or dreams." Fed. R. Evid. 412, Advisory
> Committee Notes to 1994 Amendments ("Advisory Committee
> Notes"); *see also Sheffield v. Hilltop Sand & Gravel Co.*, 895 F.
> Supp. 105, 108 (E.D.Va.1995) (ruling that "[e]vidence relating to
> the plaintiff's [allegedly vulgar] speech is certainly evidence
> offered to prove an alleged victim's 'sexual predisposition'" and is
> therefore covered by Rule 412). The purpose of the amended rule
> is "to safeguard the alleged victim against the invasion of privacy,
> potential embarrassment and sexual stereotyping that is associated
> with public disclosure of intimate sexual details and the infusion of
> sexual innuendo into the factfinding process." Advisory
> Committee Notes.

*B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1104 (9th Cir. 2002), *as amended* (Feb. 20, 2002)

(alterations in original).

### 4. Rule 608

Rule 608 of the Federal Rules of Evidence provides:

> Except for a criminal conviction under Rule 609, extrinsic
> evidence is not admissible to prove specific instances of a
> witness's conduct in order to attack or support the witness's
> character for truthfulness. But the court may, on cross-
> examination, allow them to be inquired into if they are probative of
> the character for truthfulness or untruthfulness of . . . the witness.

Fed. R. Evid. 608. In other words, "[s]pecific instances of a witness's conduct, other than a

conviction of a crime, that are offered to attack or support a witness's character for truthfulness

may not be proved by extrinsic evidence. Evidence is 'extrinsic' if offered through documents or

other witnesses, rather than through cross-examination of the witness himself or herself." 4

*Weinstein's Fed. Evid.* § 608.20[1] (2023) (footnote citations omitted).

## BACKGROUND

This federal criminal case concerns Defendant's activities while employed as a

corrections nurse at CCCF. Viewed in the light most favorable to the government, the evidence

shows that on various occasions in 2016 and 2017, Defendant, while acting under color of law

and without a legitimate penological or medical purpose, engaged in various sexual acts with

nine adult female inmates who were incarcerated at CCCF.[1] Defendant's conduct resulted in

bodily injury to three female inmates and included aggravated sexual abuse against four female

inmates. Defendant also engaged in similar uncharged sexual misconduct against other AVs who

credibly testified about this related conduct.

The evidence also shows that on November 20, 2019, Defendant, having taken an oath to

testify truthfully at a deposition ancillary to a civil lawsuit then pending in the United States

District Court for the District of Oregon, knowingly made false and material declarations.

---

[1] These adult victims are referred to as "AVs" followed by a number, which is how the
original 12 were presented in the indictment and the other nine in briefing, to preserve their
confidentiality. Although the AVs who testified identified themselves during trial, the Court
continues to refer to them by their AV number to preserve their confidentiality.

Defendant testified under oath that he did not engage in sexual conduct with inmates at CCCF, knowing such statements were false.

## DISCUSSION

### A. Motion for Judgment of Acquittal

Defendant moves for judgment of acquittal on five counts. The Court addresses each in turn.

#### 1. Count 1-AV1

Defendant argues that no rational juror could conclude beyond a reasonable doubt that Defendant penetrated AV1's vulva without her consent. Defendant argues that AV1 testified that the incident occurred after she had requested modifications to her work restrictions and the medical records show that her appointment for that was September 19, 2017, a day on which Defendant did not work. Defendant asserts that the government's argument that AV1 may have had a medical appointment on September 18th and seen Defendant is "pure speculation" and cannot support the guilty verdict.

Exhibit 24 shows that on September 17, 2017, AV1 submitted a request for a medical "call out" to triage to modify her work restrictions. In response, she was informed that she would be seen by "nursing staff." Exhibit 208 shows that on September 18, 2017, AV1 received a call out, although the location to which she was called is not identified. There is no corresponding medical chart note for September 18, 2017. Defendant worked in the minimum-security medical unit on September 18, 2017.

AV1 testified in detail about her sexual assault by Defendant and explained that the appointment in which Defendant assaulted her was after she requested a modification to her

work restrictions.[2] She did not know the precise date because she had multiple appointments related to that request. Medical records show that she had appointments on September 19 and 28. Carol Thompson, a registered nurse who worked for ten years at CCCF, testified that when an inmate was called out to medical, the record would be the chart note prepared by the medical staff who conducted the visit. Ms. Thompson testified that it depended on the medical staff to record or chart a visit. The government argued that Defendant assaulted AV1 on September 18, 2017, when she was called out, and Defendant did not create a chart note to cover up his assault. This is a reasonable inference from the evidence, viewed in the light most favorable to the government. The Court rejects Defendant's argument that no rational juror could find Defendant guilty of this assault.

Defendant also argues that no rational juror could find aggravated sexual abuse and bodily injury for this count. Defendant contends that AV1's testimony did not support that Defendant used physical force, placed her in fear for her life, or caused bodily injury. AV1, however, testified that "It hurt," when describing Defendant's assault. The Court instructed the jury: "'Bodily injury' includes: (1) physical pain; (2) illness; or (3) any other injury to the body, no matter how temporary. Physical pain, no matter how temporary, satisfies this element." ECF 271 at 22; *see also* 18 U.S.C. § 831(g)(5) (defining bodily injury to include "physical pain" and "any other injury to the body, no matter how temporary"); 18 U.S.C. § 1365(h)(4) (same). Thus, a rational juror could conclude that Defendant's sexual assault of AV1 resulted in bodily injury because she testified that she was in pain at the time of the assault.

---

[2] The Court's discussions and quotations of trial testimony are based on the recollection of the undersigned judge and a review of the rough transcripts as needed to refresh recollection. They are not meant as final trial transcripts.

As to aggravated sexual abuse, the Court instructed the jury: "To prove the Defendant's conduct included aggravated sexual abuse, the government must prove that the defendant knowingly caused another person to engage in a sexual act either: (1) by using physical force against that other person; or (2) by placing that other person in fear that she will be subjected to serious bodily injury." ECF 271 at 21. "The force requirement is met when the sexual contact resulted from a restraint upon the other person that was sufficient that the other person could not escape the sexual contact." *United States v. Archdale*, 229 F.3d 861, 868 (9th Cir. 2000) (quotation marks omitted).

AV1 testified that Defendant had her touch his penis. He then "took control of the situation." Defendant had AV1 stand up, he "turned her around," had her pull down her pants, "laid her head down," pushed her down on the exam table to "make sure she did not turn around," and penetrated her vagina with his penis. Defendant's pushing AV1 down on the table cabining her between him and the table, thereby ensuring she could not leave, is sufficient evidence to meet the force element for aggravated sexual abuse. *See United States v. Lucas*, 157 F.3d 998, 1002 n.9 (5th Cir. 1998) ("Lucas's pressing the victim against a table and thereby blocking her means of egress suffices to constitute force within the meaning of § 2241."); *see also United States v. Simmons*, 470 F.3d 1115, 1121 (5th Cir. 2006) (holding that the evidence was sufficient to support an aggravated sexual abuse conviction under § 2241 when the defendant forced the victim to perform oral sex by pulling her head and she was unable to escape the rape because the defendant pinned her between his body and his vehicle); *United States v. Denjen*, 258 F. Supp. 2d 194, 199 (E.D.N.Y. 2003), *aff'd*, 101 F. App'x 362 (2d Cir. 2004) ("Here also, the victim was in a completely secluded area, her egress was blocked by Denjen standing between her and the cell door as well as by his physical weight pressing her against the bed during one of the sexual attacks."); *cf. United States v. H.B.*, 695 F.3d 931, 936 (9th

PAGE 10 – OPINION AND ORDER ON POST-TRIAL MOTIONS

Cir. 2012) (concluding that "the record supports the reasonable inference that W.B.'s weight on top of T.T.W., combined with his efforts to silence T.T.W. by covering her mouth with his hand, and H.B.'s physical restraint of T.T.W.'s right leg, together allowed W.B. to engage in unwanted sexual contact from which T.T.W. could not escape immediately").

In addition, the power disparity between Defendant and AV1 is another factor that adds to the calculus of force employed. *See H.B.*, 695 F.3d at 936 ("In addition, the offense involved a power disparity in which the two teenage boys acted together against T.T.W."); *Lucas*, 157 F.3d at 1002 (concluding that "force can be implied from a disparity in size and coercive power between the defendant and his victim"). Therefore, considering the evidence in the light most favorable to the government, a rational juror could conclude that Defendant used force to engage in a sexual act with AV1.

### 2.  Count 4-AV2

Defendant asserts in a conclusory fashion that AV2's testimony fails to meet the elements for aggravated sexual abuse and bodily injury. Defendant, however, offers no argument or discussion of the evidence presented at trial.

AV2 testified to a similar situation as AV1. After AV2 received her cancer injection in her abdomen from Defendant, he helped AV2 off the table and then turned her around and pressed himself behind her over the table. Defendant bent AV2 over and penetrated her from behind. Thus, she was pinned between the table and Defendant's body. AV2 testified that she did not feel like she could leave the room. After Defendant finished, AV2 "rushed out of there." For the same reasons the evidence of Defendant's conduct, viewed in the light most favorable to the government, supports the jury's finding of aggravated sexual abuse with respect to AV1, it supports the jury's finding regarding AV2. Defendant's use of his body and the table to block AV2 is sufficient force, particularly combined with the power disparity.

As to bodily injury, AV2 testified that during Defendant's sexual assault, the site of AV2's cancer injection was pushed against the table and was "in pain." Therefore, a rational juror could conclude that Defendant's sexual assault resulted in bodily injury.

### 3. Count 9-AV3

Defendant argues that no rational juror could conclude that this sexual assault occurred as testified by AV3 because there is no documentation of the type of examination by Defendant on the alleged date, November 13, 2017. Defendant argues that the government attempted to impeach the medical records but failed.

AV3 testified in detail about an incident that occurred in November 2017. She testified that officers took her to triage outside of segregation to have her ear examined. Her hands were cuffed behind her back, and she had shackles on her ankles. An officer helped her up onto an examination table. Defendant stated that he needed to flush her ear and required a cup or bowl to catch the liquid. One officer left the room to search for a cup or bowl, and the other officer searched within the room. At that point, Defendant searched the cabinets within the examination table and then quickly pinched AV3's nipples through her shirt and winked at her. AV3 testified that she felt helpless that Defendant would be so brazen to do that while she was handcuffed and an officer was in the room. On cross-examination she testified that these events occurred approximately two days after she had been placed in segregation, which would be November 13, 2017. She described the process for having her ears flushed and rejected defense counsel's attempt to assert that her medical appointment to flush her ears was on November 12, 2017, with a different nurse. She explained that her November 12th appointment was her "pre-confinement" appointment, which is mandatory when an inmate has been sprayed with a chemical irritant, which occurred in her situation.

Defendant argues that no evidence supports the jury's verdict because there is no chart note for any purported visit on November 13, 2017, the day on which Defendant allegedly assaulted AV3. AV3's testimony, however, is evidence. Additionally, medical records show that Defendant worked in the segregation medical unit on November 13, 2017. Defendant points to no other chart note describing flushing AV3's ear. Viewing the facts in the light most favorable to the government, a reasonable juror could have concluded that Defendant failed to create a medical chart note on November 13, 2017 to cover up his assault.

### 4. Count 12-AV6

Defendant argues that no rational juror could have convicted Defendant of this count based on the timing of the alleged assault. Defendant contends that AV6 testified that this incident occurred while she was in minimum security, that AV6 admitted she told the government the assault occurred before Christmas, and that AV6 was not moved to minimum security until December 23, 2017. Defendant's recital of the evidence, however, is incomplete.

AV6 testified that she relocated to minimum security. She explained that she was called to the medical unit without having signed up. Defendant called her to medical as a follow up to a conversation they had when AV6 was in a wheelchair, in which Defendant stated he would help AV6 obtain the data from a device related to her heart condition. At that promised follow-up appointment, Defendant crawled under a table to plug in the device. As he stood up, he caressed AV6's leg from her calf, up her inner thigh, across her vagina, and into the groin of her opposite thigh, over her clothes. AV6 demonstrated for the jury how she was touched by Defendant. She also showed where in the nurses' station the touching took place by pointing on a photograph received as Exhibit 151. She testified that another nurse was present but had his back turned toward her. She pointed out his location. AV6 described the pressure and speed of Defendant's touch. She also described the device Defendant was working on and how it operated.

PAGE 13 – OPINION AND ORDER ON POST-TRIAL MOTIONS

On cross- examination, defense counsel asked AV6 when the touching incident at the nurses' station in minimum security occurred. AV6 responded, "I couldn't tell you. I know it would have been after December because that's when I was moved over to minimum." Defense counsel showed AV6 a document to help refresh her recollection. After reading the document, AV6 stated, "It would have been after Christmas." Defense counsel had her read the paragraph again, and AV6 began reciting what the document stated, when the Court clarified the purpose of a document used to refresh recollection. When asked whether the document refreshed her recollection, she responded, "It helps confuse it, I think." She then admitted in response to defense counsel's questioning that when interviewed by the FBI, she told them that the incident occurred before Christmas.

AV6 testified in detail about the incident. She was confident that the incident occurred when she was in minimum security. She showed where in minimum the incident occurred based on a photograph. She was not confident, however, about the precise timing, although she repeatedly testified that it was after Christmas. She admitted that she had told the FBI that it was before Christmas, but also testified that she was confused on this point. It was a reasonable inference for the jury to conclude that she inaccurately recalled the date as being before Christmas when telling the FBI that detail three years after the alleged events. Dates are not necessarily memorable to that level of detail at any time, let alone in prison where days more easily blend together. Viewing AV6's testimony in the light most favorable to the government, a rational juror could conclude that the assault occurred when AV6 was in minimum, after Christmas, as she testified at trial.

### 5. Count 15-AV7

Defendant argues that no rational jury could have convicted him of this count because he wrote the notation "EMER" on the medical record that he prepared memorializing the interaction

in which he treated AV7 and during which, she testified, Defendant assaulted her. AV7 testified that it would often take several steps to get seen by the medical unit unless there was an emergency. She stated she had severe rectal bleeding, went to the bathroom, and "woke up" on the floor. She reported to an officer that she passed out and needed to go to medical on an emergency basis. The officer told her to put on her shorts and walk to the medical unit. She went to medical and was treated by Defendant, who had her put her feet in the stirrups of the examination table and digitally penetrated her vagina while checking her rectal bleeding.

Defendant argues, without citing any evidence in the trial record, that "multiple" witnesses testified that the notation "EMER" meant that the medical provider would have treated the patient in the location of the emergency. Defendant does not identify these purported witnesses or their testimony that supports his argument. The testimony at trial, however, was not that emergency appointments were always treated outside the medical unit, and particularly not when viewed in the light most favorable to the government.

Teresa Hannon, Assistant Medical Services Administrator for the Oregon Department of Corrections and a registered nurse, reviewed Exhibit 80, the medical treatment record from Defendant's treatment of AV7. Ms. Hannon testified that the emergency designation meant an unscheduled appointment, not necessarily on a "call out." On cross-examination, defense counsel asked if that designation meant that a patient would typically go to nurse triage to get an appointment with a provider, and Ms. Hannon responded that it would depend on the severity of the situation. When questioning Ms. Thompson, the government elicited "background" on the general procedures involving inmate care. Ms. Thompson testified that one method by which an inmate can get "called down to medical" or "end up in medical" was to have a medical emergency, which is different from having a scheduled call out or getting called down to medical for an unscheduled call out. Michael Brasch, a registered nurse who worked for 11 years at

CCCF, reviewed Exhibit 80. In considering the "EMER" designation, Mr. Brasch testified that there is a difference between an emergency and a scheduled appointment. He stated that an emergency designation "suggests" that the provider goes to the inmate for treatment.

The testimony of Ms. Hannon and Ms. Thompson supports that emergency treatment sometimes took place within the medical unit. The testimony of Mr. Brasch was not definitive that such treatment *always* took place where the inmate was located. Viewed in the light most favorable to the government, the testimony as a whole was not dispositive that the "EMER" designation required treatment outside the medical unit. Further, AV7 testified in detail about her treatment in the medical unit, even describing putting her feet in the stirrups of the treating table. It was the province of the jury to reconcile inconsistencies in testimony. The Court rejects Defendant's argument regarding this count.

## B.  Motion for New Trial

Defendant argues that he is entitled to a new trial based on newly discovered evidence. This purported new evidence is: (1) evidence produced from a Rule 17(c) subpoena issued to Viapath Technologies, which runs the website "Paper Dolls"; and (2) recorded telephone calls from Columbia County Jail, which recorded AV3's telephone calls. Because Defendant fails to show that this purportedly new evidence is material, is not cumulative or merely impeaching, and would probably result in acquittal, Defendant's motion fails.[3]

### 1.  Paper Dolls Evidence

Before trial, the Court ruled on the government's Motions *in Limine* and other pretrial motions. This included the government's Motion *in Limine* No. 6, to exclude under Rule 412

---

[3] The government also argues that the evidence is not newly discovered because it has been available or in the possession of Defendant for years and that Defendant was not diligent in obtaining the information. Because the Court finds that Defendant fails to show the other three

evidence of the sexual history, sexual acts, or other sexual behavior of the AVs. Defendant generally did not oppose the motion, although Defendant argued that if a witness had engaged in sexual assault, that would be relevant evidence for the jury to hear. The Court disagreed and granted Motion *in Limine* No. 6.

Defendant also filed his own Motion *in Limine* under Rule 412. Defendant moved to exclude evidence of the AVs' "sexual behavior" and "sexual predisposition," and argued that evidence of previous sexual assault by someone else on an AV constituted such inadmissible evidence. The government did not dispute most of the Defendant's motion on that point but argued that the government should be able to introduce evidence that Defendant targeted women whom he *believed* had previously been sexually abused and thus more vulnerable to manipulation, to show Defendant's willfulness. The Court agreed that evidence of Defendant's conduct in identifying and targeting such women would be admissible, but general evidence that an AV had been sexually abused previously by someone else was inadmissible.

Defendant additionally moved to continue the trial, raising the issue of evidence related to the website "Paper Dolls." In responding to this motion, the government argued that "[t]o the extent the defendant intends to present evidence or argument about AV7's 'provocative photos,' ECF No. 137 at ¶ 16, he is precluded from doing so by Rule 412 of the Federal Rules of Evidence." ECF 142 at 8. The government stated that evidence about "provocative photos" on the Paper Dolls website was irrelevant, inadmissible, and unduly prejudicial.

During trial, defense counsel asked AV6 about her communications on the website Paper Dolls. AV6 explained that inmates post their photographs so that people outside the prison can

---

required elements, the Court declines to reach the issues of diligence and whether the evidence qualifies as newly discovered.

see the pictures, write to female inmates, and even send them money. AV6 described that she posted on Paper Dolls and a person wrote and asked AV6 to marry him. She then stopped posting on Paper Dolls.

Defense counsel also asked AV13 about the Paper Dolls website. AV13 testified that she posted on the website for several years and that she posted photographs of herself. When defense counsel asked whether the website also posts the type of contact that the inmate is looking for, the government objected on relevance grounds. The Court overruled the objection.

Defense counsel also questioned AV7 about Paper Dolls. She testified that the website is a way to connect with people on the outside. She stated that she does not use Paper Dolls to obtain money. Defense counsel asked AV7 to confirm that her Paper Dolls profile discusses that she has "quite the active imagination."

Defense counsel next began to question to AV11 about Paper Dolls. The Court brought counsel to sidebar. At sidebar, the Court explained that after allowing Defendant the opportunity to show the relevance of this line of questioning over the government's objection, Defendant had not done so. The Court stated it would sustain a renewed relevance objection by the government. After returning from sidebar, the Court asked whether there was an objection. The government renewed its relevance objection, and the Court sustained the objection.

Defendant now argues that he is entitled to a new trial because he received significant data from the vendor who runs the Paper Dolls website. Defendant argues this information is material because it shows that witnesses engaged in "schemes" to make money through "false statements." Defendant also argues that it shows witnesses testified falsely.

Defendant asserts that "multiple AVs extorted money" because "[t]he records received by defense are filled with, at times extraordinarily graphic, sexual messages between some of the AVs and persons from the outside, while repeatedly collecting money from those individuals."

ECF 285 at 6, ¶ 11. Defendant, however, does not explain how sending sexual messages and photographs and receiving money (even asking for money under these circumstances) amounts to "extortion." Defendant also characterizes the AVs as lying to persons by representing that they are exclusive romantic partners when the AVs were also communicating with other romantic partners and receiving money from other romantic partners.[4]

Defendant argues that this evidence is material to the Defendant's ability to show that the AVs made fraudulent statements about Defendant to try to obtain money and that they have a longstanding pattern of doing so. The Court rejects Defendant's characterization of this evidence. In any event, Defendant is relying on evidence that the AVs posted sexualized photographs of themselves and sexually graphic messages and then "sold" them for money. Such evidence of sexual behavior is inadmissible under Rule 412 of the Federal Rules of Evidence. *See United States v. Laursen*, 847 F.3d 1026, 1036 (9th Cir. 2017) ("The district court's ruling [excluding evidence under Rule 412] was consistent with our precedent because Laursen was seeking to introduce the evidence as past behavior that was other than the offense charged." (quotation marks omitted)); *see also United States v. Walker*, 917 F.3d 1004, 1009 (8th Cir. 2019) (concluding that "[t]he district court did not violate Walker's Fifth and Sixth Amendment rights by excluding the evidence of W.F.'s sexual communications with other men" when the defendant sought to admit evidence that the victim "sent and received numerous sexual communications with a number of people during the same period of time he sexted" the defendant because the evidence was inadmissible under Rule 412).

---

[4] Although Defendant characterizes this evidence as applying to "multiple AVs," Defendant specifically identifies evidence relating only to AV4 and AV11.

The evidence also is inadmissible under Rules 401, 403, 404, and 608 of the Federal Rules of Evidence. The evidence is not relevant—Defendant did not assert a defense that the AVs had consensual sex with Defendant in exchange for money. This also goes to the evidence's inadmissibility under Rule 404. It is character evidence inadmissible to show propensity. It is so far removed from Defendant's theory—that the AVs lied about Defendant committing sexual assault to obtain money—that it is not relevant to show a plan or scheme and thus is inadmissible under Rule 404(b). Posting semi-nude photographs and sending sexually explicit messages and having men send money to receive them does not provide evidence tending to support that a person lied about being sexually assaulted. This evidence also is character evidence that does not go to the AVs' character for truthfulness, and thus extrinsic evidence may not be admitted or asked about on cross-examination under Rule 608. Finally, any minimally probative value or relevance it may have, if any, to the defense that the AVs engaged in a scheme fraudulently to obtain money by falsely accusing Defendant of committing sexual assault is substantially outweighed by the danger of unfair prejudice and confusing the jury.

Thus, the evidence is inadmissible, and inadmissible evidence cannot be material under Rule 33. *See United States v. Chapman*, 851 F.3d 363, 382 (5th Cir. 2017) ("[A] motion for new trial may not be based on inadmissible evidence." (quotation marks omitted)); *United States v. Westmoreland*, 712 F.3d 1066, 1075 (7th Cir. 2013) ("[T]he evidence must be admissible to be material."); *United States v. Hinkson*, 585 F.3d 1247, 1265 (9th Cir. 2009) (concluding that the district court did not abuse its discretion in denying a motion for new trial in part because the evidence was inadmissible). Inadmissible evidence also could not result in acquittal. *See Hinkson*, 585 F.3d at 1267 ("So, what effect on a jury could excluded evidence have? None.").

Defendant also submits examples that he argues demonstrate the value of the new evidence and why it requires a new trial. Defendant asserts that the evidence shows that AV6

asked for help setting up a Paper Dolls account three times, on June 30, July 5, and July 15, 2016. Defendant argues that this demonstrates the falsity of AV6's testimony that she was on Paper Dolls for only a short time. The Court does not find that asking for assistance in *setting up* an account belies testimony that she was *on* Paper Dolls for a short period. Indeed, based on Defendant's evidence, as of July 15, 2016, AV6 still had not activated her Paper Dolls account. Defendant's proffered evidence does not in any way show when AV6 actually activated her account or for how long it was active. Further, this evidence is cumulative to AV6's testimony that she was on Paper Dolls or is at best merely impeaching, is irrelevant, and would not "probably" result in an acquittal given that it is in inadmissible or at most minimally probative, especially considering the other evidence at trial.

Defendant also contends that the new evidence shows that AV6 exchanged messages with a nonincarcerated individual about "selling" semi-nude photographs of herself and asked a nonincarcerated individual about acting as AV6's "pimp" by setting up a similar profile on Craigslist. Evidence that AV6 posted semi-nude photographs, corresponded with men, and obtained money for posting such photos is sexual behavior that is inadmissible under Rules 401, 403, 404, 412, and 608, for the same reasons discussed above. The evidence therefore would be excluded, is immaterial, and thus could not probably result in acquittal.

Defendant also argues that new evidence relating to AV7 is material because it shows that AV7 lied in testifying that she was not interested in a lawsuit and about the closeness of her relationship with AV13. Defendant mischaracterizes AV7's testimony and fails to show how the new evidence is not merely impeaching or would probably result in acquittal.

The new evidence is a message from AV7 to AV13 that Oregon passed a law regarding the statute of limitations on sexual assault and thus AV7's lawsuit "still has action" and that she could "buy into" AV13's business. AV7 testified that she was "not doing this for a lawsuit" and

she "never was." She also testified that she and her husband talked about filing a lawsuit but did

not pursue it. Not "doing this" (filing a grievance, testifying in court) *for* a lawsuit is not

inconsistent with expressing an interest in filing a lawsuit after discovering the statute of

limitations had been expanded. Although AV7 may not have raised her allegations *for* purposes

of filing a lawsuit, that does not preclude her from having an interest in filing a lawsuit or

actually filing one. Nor is expressing an interest in filing a lawsuit inconsistent with having

discussed filing a lawsuit but not pursuing it at the time. To the contrary, that testimony is

consistent with the new evidence. She testified that she had an interest in pursuing a lawsuit at

some point. The "newly discovered" message shows only that she had an interest in pursuing a

lawsuit at some point, which is consistent with her testimony.

       Additionally, this evidence is at best merely impeaching and thus fails to support a new

trial. Defendant argues that this evidence is material under *United States v. Davis*, 960 F.2d 820

(9th Cir. 1992), and *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978). Under *Davis*, "[i]n

some situations . . . the newly discovered impeachment evidence may be so powerful that, if it

were to be believed by the trier of fact, it could render the witness' testimony totally incredible."

*Davis*, 960 F.2d at 825. This occurs when "the witness' testimony were uncorroborated and

provided the only evidence of an essential element of the government's case." *Id.* AV7's

testimony on the point of whether she was interested in filing a lawsuit does not meet this

standard. It was not the only evidence of an essential element of the government's case.

       It also does not qualify under *Butler*. In *Butler*, a key witness was promised by the

prosecution that charges would be dropped if the witness testified favorably to the government.

*Butler*, 567 F.2d at 887. The witness denied this fact on the stand. *Id.* The Ninth Circuit held that

this "egregious" false testimony "could, in any reasonable likelihood, have affected the judgment

PAGE 22 – OPINION AND ORDER ON POST-TRIAL MOTIONS

of the jury." *Id.* at 891. Defendant's new evidence about AV7 does not meet this standard. AV7's testimony was not directly perjurious and was not sufficiently egregious or material.

Defendant also fails to show that this evidence would have probably resulted in acquittal. Not only is the evidence immaterial and at best merely impeaching, but Defendant cross-examined AV7 on statements she made to the FBI about wanting to sue Klein and the Department of Corrections. Defendant offers no persuasive argument that having one more general statement from AV7 about her interest in filing a lawsuit would have made any difference.

Defendant also asserts that new evidence of multiple messages between AV7 and AV13 shows that they had a close relationship, "much different" than they described at trial. AV7's testimony at trial, however, was that they had a close relationship. AV7 confirmed that she knew AV13. AV7 agreed she was in a "tight group" with AV13 and one other inmate. AV7 agreed that it was a group that would "protect each other" and when asked if they would "have each other's backs," AV7 responded, "They are my family." She also agreed that she had "just spoke recently" with AV13. AV7 *sua sponte* characterizing AV13 as "family" is as close a relationship as she could describe. The Court rejects Defendant's arguments about new evidence relating to AV7's relationship with AV13.

In summary, Defendant raises no meritorious argument supporting a new trial based on the information Defendant received from Viapath Technologies. The Court next considers Defendant's arguments based on the audio recordings received from Columbia County Jail.

### 2. Jail Recordings

In Defendant's opening motion for a new trial, he did not identify any content from the recordings he obtained from the Columbia County Jail. Instead, he explained that he had been

unable to review the recordings. Thus, he offered no argument about how the recordings are material, not cumulative or merely impeaching, and would probably lead to an acquittal.

In his reply, however, Defendant offered one recording, combined with a post-trial email from prosecutors, in support of his motion. Even allowing Defendant to raise this new argument in his reply, the argument fails on the merits.

On August 24, 2023, prosecutors emailed defense counsel and notified them that AV3 had asked prosecutors after trial to write a "character letter" on AV3's behalf in support of her petition to be re-housed in Oregon instead of Florida. Prosecutors informed defense counsel that they told AV3 that they would have to see what they would be allowed to do. They concluded that they could not write her a "character letter" but could instead write a letter summarizing the facts—that she was subpoenaed to testify in Oregon as a victim-witness, that she did so, and that the prosecutors were unaware of any disciplinary issues that arose while she was in custody. Because the prosecutors did not have a reliable method of communicating with AV3, they had not yet notified her of their response to her request.

Defendant states that in an audio recording before trial, AV3 commented to a family member:

> I hate to say this but I'm excited to get this shit over with and get back to Florida so I'm going to be able to find out if I can get back to Oregon. Because the FBI has not been able to get a hold of the people in charge of my review and I don't know if I can come back to Oregon until I find out what is finalized with my review.

ECF 291 at 5.

Defendant argues that this telephone call is evidence that the FBI was helping AV3 with her review and transfer back to Oregon. Defendant contends that such an "expected benefit" is information that was critical to know during trial.

PAGE 24 – OPINION AND ORDER ON POST-TRIAL MOTIONS

The Court does not interpret AV3's recorded statement as relaying that the FBI was helping her get transferred to Oregon. The Court construes her statement as saying only that the FBI had tried to help her by *contacting* (i.e., "get a hold of") the people in charge of her review so AV3 could *find out* the results of her review, not that the FBI was trying to *influence* the results of that review. A reasonable inference is that while in Oregon in federal custody, AV3 had difficulty communicating with Florida state court authorities to discover the status of her transfer request and the FBI was a means of communication. But because the FBI could not reach the people in charge of the review, AV3 had to wait until she returned to Florida (i.e., "get back to Florida") to know whether her request to transfer to Oregon had been approved. As shown by AV3's recorded comment, however, the FBI was unsuccessful in communicating with Florida and thus AV3 had no expectations from the FBI at this point. She was instead waiting to return to Florida to find out the results of her review. At any rate, the only expectation AV3 had before was that the FBI would contact the review personnel and relay to AV3 the results of Florida's review of her requested transfer. That is not a material "expected benefit."

The email sent by prosecutors relaying the post-trial request by AV3 further supports this understanding. After trial, AV3 requested actual help with her transfer request—that the prosecutors provide a character letter. The prosecutors notified defense counsel about this request. The Court rejects Defendant's argument that the audio recording or the email provide new material evidence that would probably lead to an acquittal.

Defendant offers no other argument that any other recording from Columbia County Jail is material, not impeaching or cumulative, and would probably lead to acquittal. Thus, the Court rejects Defendant's motion for a new trial based on the audio recordings.

## CONCLUSION

The Court DENIES Defendant's Motion for Judgment of Acquittal, ECF 283, and

Defendant's Motion for New Trial, ECF 284.

**IT IS SO ORDERED**.

DATED this 5th day of October, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge