NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**GAVIN W. BRUCE, OSB #113384**
Assistant United States Attorney
Gavin.Bruce@usdoj.gov
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone:  (541) 465-6771
**CAMERON A. BELL, CSB #305872**
Trial Attorney—Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Cameron.Bell@usdoj.gov
Telephone:  (202) 802-7643
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No. 3:22-cr-00084-SI |
| v. | **UNITED STATES'** |
| **TONY DANIEL KLEIN,** | **SENTENCING MEMORANDUM** |
| **Defendant.** | |

Over the course of his employment as a prison nurse at the Coffee Creek Correctional Facility (CCCF or "Coffee Creek"), the defendant sexually assaulted and abused numerous female inmates who were entrusted to his care.  The defendant preyed on his victims, knowing that they would not dare report his crimes, because they would not be believed.  At trial, he was convicted of 21 crimes.  For his conduct, totaling an offense level that exceeds 43, the corresponding advisory range from the U.S. Sentencing Guidelines ("USSG" or "Guidelines") is life imprisonment.  Based on those Guidelines, the information contained in the Presentence Report (PSR) and the factors outlined in 18 U.S.C. § 3553(a), the United States believes that a sentence of no less than 41 years'

imprisonment, up to a Guidelines-sentence of life imprisonment, is the appropriate sentence in this case.

A sentence of at least 41 years can attempt to account for the defendant's harm to each victim for whom his conduct resulted in a conviction: 30 years for each victim of aggravated sexual abuse, to run concurrent (AVs 1, 2, and 3, reflecting Counts 1, 4, 6, and 8); followed by 10 years for each victim of a felony count that did not include aggravated sexual abuse (AV4, reflecting Count 10); followed by one year for each victim of a misdemeanor count, to run concurrent (AVs 5, 6, 7, 10, and 11, reflecting Counts 11, 12, 13, 14, 15, 18, and 19).  Anything less than 41 years' imprisonment does not sufficiently reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, or afford adequate deterrence to criminal conduct—both for this specific defendant and for others who may contemplate following in his footsteps.

I.      **Factual and Procedural Background**

From 2010 to 2017, the defendant worked as an Institution RN at Coffee Creek, the only women's prison facility in the state of Oregon.  As early as 2013 or 2014, he began sexually abusing the women incarcerated there, either when they sought medical treatment or when they worked as orderlies in the medical unit, alongside the defendant.  In both circumstances, the defendant worked methodically, slowly gaining his victims' trust. Some of the defendant's victims were as young as 19 or 20 years old when he sexually assaulted them; others were in their 30s and 40s.  Some had chronic medical conditions, making them dependent on the defendant's care and that much more reluctant to even consider reporting his abuse.  But all of the women he sexually assaulted and abused were united by a single commonality: they were in prison, where they had little power and agency over their daily lives.  The defendant exploited that lack of power.  He

acted with impunity and with a conviction that the rules did not apply to him, that he would not be caught.

In November 2017, the defendant was interviewed by members of the Oregon State Police after one CCCF inmate came forward to report that the defendant had engaged in sexual conduct with her. The defendant resigned from CCCF in January 2018. In 2019, the defendant was sued in federal court by ten women; the lawsuits asserted that he sexually abused each of the ten plaintiffs while he was employed at Coffee Creek and they were incarcerated there. In November 2019, the defendant was deposed as part of that litigation, and he expressly denied any and all sexual contact with any incarcerated woman while he had worked at Coffee Creek.

In March 2022, the defendant was charged with 19 counts of violating 18 U.S.C. § 242, stemming from his sexual conduct while employed at Coffee Creek, and four counts of violating 18 U.S.C. § 1623, based on false statements he made in the 2019 deposition. In June 2023, the United States dismissed Counts 20 and 21 of the Indictment. Trial began on July 10, 2023. In addition to the 11 victims identified in the indictment, six other women credibly testified about how the defendant sexually assaulted them or directed other sexually explicit behavior toward them, collectively comprising ten more sexual assaults or attempted assaults. On July 25, 2023, the jury returned its verdict, convicting the defendant of Counts 1 through 15 and Counts 18 and 19, pertaining to AVs 1 through 7 and AVs 10 and 11. The jury also found the defendant guilty of Counts 21 through 25.

II.   **Legal Argument**

   a. **Advisory Guidelines Calculations**

The United States generally agrees with the Guidelines as calculated in the PSR, which results in a Total Offense Level of 43. As discussed in greater detail below, the United States

submits that the two contested adjustments—for obstruction of justice and for targeting a vulnerable victim—should each apply. Still, the advisory range that corresponds with a Total Offense Level of 43 is a sentence of life imprisonment.

Notably, this corresponding sentence of life imprisonment accounts only for the 17 sexual assaults for which the defendant was convicted, involving nine separate women. It does not account for the ten sexual assaults of AVs 13, 15, 16, 17, and 20, and his sexual conduct toward AV21, nor does it account for the similar sexual misconduct toward the AVs who did not testify at trial, particularly AVs 14 and 18, who testified under oath in a civil deposition about how the defendant sexually assaulted each of them. *See generally* ECF No. 87 (describing allegations by AVs 14 and 18). It is because of this additional relevant conduct, as well as the other factors described below, that the PSR's recommendation of 360 months is insufficient and a sentence of no less than 41 years (492 months) is appropriate.

### i. Obstruction Adjustment

As noted in the United States' objections to the PSR, the two-level increase for obstruction of justice is appropriate for Count 4 because the defendant instructed AV2 to lie—a lie that would make his crime less likely to be discovered. As AV2 testified, immediately after he sexually assaulted AV2 and sent her back to the housing unit, he instructed her to lie about why she was wearing shorts if anyone asked. Evidence at trial established that inmates had to be "properly dressed" to go to the medical unit, which meant they were not permitted to wear shorts unless they had been directed to do so by a medical provider. As AV2 testified during the trial, she wore shorts to the medical unit that day because she was told to do so. She further testified that after the defendant raped her, he told her words to the effect of, "If anyone asks why you're wearing shorts, tell them I was looking at your knee." The defendant knew, however, that AV2 had sought medical

treatment not for her knee but for her breast cancer and, as AV2 testified, the defendant never examined her knee.

Encouraging a witness or victim to lie is obstruction of justice. *See United States v. Batchu*, 724 F.3d 1, 13 (1st Cir. 2013) (defendant's counseling a witness to "cover for him" is "clearly adequate by itself to require application of the enhancement"); *United States v. Snider*, 976 F.2d 1249, 1251 (9th Cir. 1992) (affirming obstruction-of-justice enhancement where defendant told victim to tell investigating park ranger that "everything was okay" shortly after defendant broke victim's jaw). The obstruction-of-justice adjustment applies even if the defendant's "unlawful influence scheme fooled no one." *United States v. Collins*, 90 F.3d 1420, 1430 (9th Cir. 1996).

Here, the defendant encouraged AV2 to lie to corrections officers who inquired about why she was wearing shorts—a lie that would protect the defendant from scrutiny and would prevent his unlawful conduct from being discovered. It is irrelevant that AV2 never needed to employ the lie. The defendant's conduct warrants a two-level increase. [1]

---

[1] The PSR did not apply this adjustment to Count 4 for two reasons: because the probation office did not conclude the defendant's instruction to AV2 to be obstruction within the meaning of USSG § 3C1.1 and because "the defendant's obstructive conduct in the civil proceeding, while related in part to the offense in Count 4, has been taken into account in Counts 22 through 25." PSR ¶ 64c. But if that obstructive conduct is to be considered as related to Count 4, then the offense level for Count 4 *should* be increased by two levels. *See* USSG § 3C1.1, cmt. 8 (if a defendant is convicted of both an obstruction offense and an underlying offense, the counts will be grouped, and "the offense level for that group of closely related counts will be the offense level for the underlying offense increased by the two-level adjustment"); *see also United States v. Lindsay*, 931 F.3d 852, 869-70 (9th Cir. 2019) (district court committed procedural error by failing to apply the two-level obstruction enhancement to the underlying offense and then imposing concurrent sentences for the underlying offense and the obstruction offense, effectively "never account[ing] for [the defendant's] obstructive conduct in his sentence as the Guidelines contemplate").

The defendant's direction to AV2 to lie, by itself, is sufficient to warrant the two-level adjustment. Given the Combined Adjusted Offense Level of 49, however, this adjustment is unlikely to have a practical effect on the ultimate Guidelines calculation. *See* USSG Chapter 5, Part A, cmt. 2.

**United States' Sentencing Memorandum**                                                                 **Page 5**

### ii. Vulnerable Victim Adjustment

Contrary to the defendant's argument, a two-level "vulnerable victim" adjustment for Counts 3 and 4 is appropriate. This adjustment is warranted not simply because AV2 was undergoing chemotherapy treatment; it is not "based solely on the victim's membership in a certain class." *United States v. Smith*, 133 F.3d 737, 749 (10th Cir. 1997). Instead, this adjustment applies because AV2 specifically relied on the defendant, a medical provider, for that chemotherapy treatment, and the defendant sexually assaulted her immediately before and immediately after he delivered that painful injection. Moreover, the defendant knew that AV2 was undergoing the treatment and that treatment was repeatedly late. As medical records presented at trial showed, on the day the defendant assaulted her (the assaults charged in Counts 3 and 4), the defendant called AV2 down to the medical unit to provide the injection. As AV2 testified, she was relieved, because she needed her life-saving chemotherapy injection and felt like someone—the defendant—finally cared enough to make sure she got that injection. AV2 testified about how the defendant offered her a pill that led to her feeling "nauseated," "real mellow," and "numb." Before providing the injection, the defendant put his fingers in AV2's vagina. Immediately after the injection, he pushed her against the exam table and vaginally raped her, and then sent AV2 back to her housing unit. The defendant's behavior suggested that this was the cost of getting her treatment—treatment that she desperately needed. Indeed, as Coffee Creek staff member Sydney McKay testified, AV2 later inquired about whether she could have a "stay separate" order on her file so that she did not need to be seen or treated by the defendant.

Under these circumstances, the fact that the defendant targeted and raped AV2, who depended upon him for critical medical treatment—chemotherapy—"render[s] [his] conduct more criminally depraved." *United States v. Wetchie*, 207 F.3d 632, 636 (9th Cir. 2000) (citing *United*

*States v. Castellanos*, 81 F.3d 108, 111 (9th Cir. 1996)).  The fact that the defendant provided that critical treatment just minutes between his two sexual assaults, first forcing his fingers inside her vagina and then pinning her against the exam table while he raped her, reaches "a new level of depravity."  *Castellanos*, 81 F.3d at 112.  Such conduct merits a two-level increase.

### b. 3553 Factors Show Why a Sentence No Less Than 41 Years Is Warranted

The factors set forth in 18 U.S.C. § 3553 demonstrate why anything less than 41 years would be insufficient to achieve the purposes described in subsection (a)(2).

### i. Nature and Circumstances of the Offenses

Based on the trial testimony and the parties' filings, the Court is familiar with the nature and circumstances of the offenses that underlie the defendant's 21 criminal convictions.  The United States focuses here not on the specific sexual acts but rather the effect that these offenses had on the defendant's victims.

During the trial, the Court heard testimony from 17 different women who were victims of the defendant's charged and uncharged conduct.  Collectively, they testified about how the defendant sexually assaulted them, whether by touching them over and under their clothing, groping their breasts, forcing his fingers into their vagina, making them perform oral sex on him, or pinning them against an exam table to vaginally rape them from behind.  All of them felt they could not say "no" and they could not report him, because they needed medical care or because they might get sent to segregation, which meant losing their privileges, their jobs, and their precious time for family visits.

The victims did not tell other inmates what the defendant had done, fearing they might be labeled a "snitch," or that such personal information might be widely disclosed within the prison.  For example, although AVs 3, 7, and 13 were extremely close friends, none of them disclosed the

defendant's conduct to each other. AV6 and Kristina Russo each testified about their close friendship, but AV6 did not tell Ms. Russo about the three times the defendant sexually assaulted her until after both women had been released. Put simply, the defendant's victims were stripped of the support systems they might have had on the outside and, while incarcerated, were too afraid to share with even their closest friends, their chosen "family," how the defendant had abused them. The defendant capitalized on that isolation and that vulnerability, and he used it to his advantage.

The defendant's crimes inflicted significant trauma upon his victims, many of whom had been sexually abused as children or young women. That trauma was apparent during the trial. The defendant's victims testified tearfully, sharing some of the most humiliating details about what he did to them. As AV7 put it, "it was traumatic and traumatizing and wrong," and "woman in her thirties knows when she is being touched the wrong way." Some had never talked publicly about the defendant's abuse, let alone in a full courtroom where the defendant sat watching. It was obvious that AV4 was extremely nervous; during her testimony, she made statements like, "I feel like I want to jump off a building" and "I feel like I'm going to throw up," asking for a break each time. More than one woman indicated that the defendant's abuse and the stress of the trial—and the possibility of testifying—had led her to relapse on drugs. Over and over again, the defendant's victims described feeling "dirty," "embarrassed," and "ashamed," even though they were not responsible for his abuse. Some of the victims delayed or avoided medical treatment, both at Coffee Creek and even after being released, because they felt unable to trust a medical provider after what the defendant did to them.

While employed at Coffee Creek, the defendant was a sexual predator in a lab coat, with access to some of Oregon's most powerless women. He moved freely in a facility where his victims' movements were constrained. He brazenly violated the law in the very place that his

victims were being held accountable for their own crimes. And he acted with the certainty that even if any victim dared report his sexual misconduct, they wouldn't be believed—because they were inmates and he was a member of the staff.

### ii. History and Characteristics of the Defendant

The history and characteristics of the defendant fail to mitigate the depravity of his conduct. If anything, his personal history and characteristics make his crimes more offensive, as they depict a calculating and manipulative man who knew right from wrong, a man who knew how to behave in society but deliberated targeted the most vulnerable of victims in a place where he had absolute control: inside the walls of Coffee Creek.

The defendant's conduct toward other, uncharged victims shows that he engaged in an unchecked pattern of sexual crimes for many years, not just the approximately eleven-month period reflected in the indictment. Courts are permitted to consider a defendant's past criminal behavior at sentencing, even if no conviction resulted from that behavior. *Nichols v. United States*, 511 U.S. 738, 747 (1994). The Court heard the trial testimony of six additional women (AVs 13, 15, 16, 17, 20, and 21), whose testimony revealed that the defendant was sexually assaulting inmates as early as 2013 and 2014. AVs 13 and 15, who had both worked as orderlies in the medical unit described the defendant's same, practiced M.O.: luring the orderlies to secluded areas under false pretenses, claiming that he needed something to be cleaned, and then forcing them to perform sex acts.

The other aspects of the defendant's history, as identified in the PSR, illustrate that he had no shortage of opportunities to succeed. He had a stable and supportive childhood, continues to have a supportive family, and does not suffer from mental-health conditions or substance-abuse disorders. His chosen profession and other activities, such as working as a volunteer firefighter

and EMT, seem to suggest that he possessed some commitment to public service and helping others. The facts presented at trial, however, portray a man who used those opportunities and his status as a medical professional not to help but to harm. The defendant used his background, profession, and reputation to gain access to vulnerable women, earn the trust of his peers and patients, and then sexually abuse the women entrusted to his care.

### iii. The Need to Reflect the Seriousness of the Offense, To Provide Just Punishment, and To Promote Respect for the Law

A sentence of no less than 41 years' imprisonment is necessary to reflect the seriousness of the offense, to provide just punishment, and to promote respect for the law.

There are few offenses more serious or more intimately invasive than sexual assault. That the defendant not only abused his position of trust—both as a staff member and as a medical provider—makes his crimes more egregious. The seriousness of his offense is exacerbated by the magnitude of his many crimes, in which he took advantage of his victims at their most vulnerable. A lengthy sentence is required to reflect the seriousness of his crimes and to provide just punishment for them.

A significant sentence is also necessary to promote respect for the law. The evidence at trial and other information clearly demonstrates that the defendant simply does not believe the law applies to him. Though sexual assault is a crime regardless of whether the perpetrator or the victims are in prison, the defendant was expressly, specifically, and repeatedly trained that *any* sexual contact with inmates in prison is a crime. It was a prohibition that could not possibly have been clearer, and the defendant had even seen other staff members get investigated for sexual misconduct. Trial testimony, as well as information learned in the investigation, indicated that there were several instances in which the defendant's sexual misconduct was nearly discovered by some of his coworkers. Still, he was undeterred. Each day the defendant went to work, he saw

firsthand the consequences of committing crimes: a prison sentence. He nevertheless chose to break the law, as if certain that he wouldn't be caught and knowing that because his victims were serving their own prison sentences, they would not be believed if they reported him.

The defendant's behavior extended not just to his sexual assaults but to trying to conceal them. For example, when OSP first approached him in 2017, he repeatedly questioned investigators, asking what evidence they had, who was accusing him, and why they wouldn't tell him more about their evidence. Even after he resigned from his job at Coffee Creek *while under investigation*, he continued to mislead. In September 2018, the defendant made false statements in his license-renewal application with the Oregon State Board of Nursing. Specifically, the defendant answered "NO" when asked whether he had been investigated for any alleged violation of any state or federal law, rule, or healthcare practice standard; but just eight months earlier, OSP obtained a warrant for the defendant's DNA, showed it to him, and swabbed his cheek. In 2020, he was reprimanded by the Board and fined $5,000 as a result of that false statement.

For years, the defendant has skirted the consequences of his actions and made abundantly clear that he does not respect the law. A prison sentence may finally demonstrate that the rules do apply to him, but only a significant sentence will have the hope of achieving that goal.

### iv. The Need To Protect the Public from Further Crimes by the Defendant and Afford Adequate Deterrence to Criminal Conduct

The need to protect the public and to afford both general and specific deterrence further supports the United States' recommended sentence. The counts of conviction in this case are not isolated incidents; they are part of a long pattern of methodical, escalating conduct by the defendant. Though the defendant is unlikely to work in a correctional setting again, his long history of sexually abusing the numerous women that he either medically treated or supervised at work demonstrates that he is a serial predator whose conduct threatens public safety. Moreover, as

described above, there is little reason to think his apparent belief that his misconduct can escape scrutiny and that the rules do not apply to him will suddenly change. There may not be any amount of time that will serve as specific deterrence for this defendant in the future. But a prison sentence of no less than 41 years will at least ensure that the public is protected from him during that time.

There is also a strong need for general deterrence. Sexual assault is often underreported and difficult to prosecute; this is particularly true when the perpetrator holds a position of power, as the defendant did here. A significant prison sentence is therefore necessary to demonstrate to the defendant's former colleagues, as well as staff in any prison setting around the country, that there are severe consequences to sexually assaulting the inmates in custody.

### v. The Need To Avoid Unwarranted Sentencing Disparities in Cases Involving Similar Crimes

A sentence of no less than 41 years' imprisonment will also avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. The United States is not aware of comparable prosecutions in this district of 18 U.S.C. § 242 involving sexual offenses and multiple victims and therefore offers information from similar color-of-law prosecutions around the country.

National data is in line with the United States' requested sentence. Most recently, in *United States v. Olivas*, the defendant, a former special agent with the Department of Homeland Security, was convicted at trial of three counts of 18 U.S.C. § 242, stemming from sexual assaults, each involving aggravated sexual abuse, of two different women. No. 5:18-CR-231, ECF No. 250 (C.D. Cal. 2022). In May 2023, the defendant was sentenced to life imprisonment. *Id.* at ECF No. 289. Other recent cases reflect similar sentences:

- *United States v. Sepulveda*, No. 7:19-CR-2120, ECF No. 78 (S.D. Tex. 2021) (30-year sentence imposed for police officer who was convicted of two counts of 18

U.S.C. § 242 (one misdemeanor count and one felony count involving aggravated sexual abuse and kidnapping);

- *United States v. Kindley*, No. 4:17-CR-267, ECF No. 177 (E.D. Ark. 2021) (life sentence plus five years imposed for transport officer convicted of two counts of § 242 (involving aggravated sexual abuse and/or kidnapping) and one count of § 924(c));

- *United States v. Shaw*, 2:13-cr-660, ECF No. 103 (amended judgment) (D. N.J. 2018) (imposing 25-year sentence for prison officer convicted of one count of § 242 for committing sexual assault that included aggravated sexual abuse);

- *United States v. Perez*, 5:13-CR-87, ECF No. 185 (C.D. Cal. 2014) (imposing a 25-year sentence for police officer convicted of three counts of § 242 (one misdemeanor and two felonies) for sexually assaulting two women in his custody);

- *United States v. Dillon*, 2:05-CR-314, ECF No. 146 (E.D. La. 2006) (imposing life sentence for city attorney's sexual assaults of two women). [2]

The defendant in this case has been convicted of sexually assaulting nine women, and the evidence at trial strongly indicated there were others. Of his 17 convictions of § 242, five are felonies. A sentence of no less than 41 years' imprisonment would not lead to unwarranted sentencing disparities based on similar conduct by sworn or civilian law enforcement.

---

[2] The United States is aware of two outliers: *United States v. Martinez*, 17-CR-281 (E.D.N.Y. 2022), and *United States v. Harvel*, 2:21-cr-5 (M.D. Tenn. 2023). In *Harvel*, the 61-year-old defendant was convicted of nine counts of 18 U.S.C. § 242 for his sexual assaults of seven women while he worked as the director of a state-run recycling center. The defendant emphasized his advanced age and poor health in requesting a significant downward variance, and he was ultimately sentenced to 17 years' imprisonment. In *Martinez*, the defendant was convicted of repeatedly sexually assaulting one woman while she had been in custody. The defendant was sentenced to 10 years' imprisonment and the United States has appealed the sentence as procedurally and substantively unreasonable. *See* Br. for the U.S., *United States v. Martinez*, Nos. 22-902 (2d Cir.) (filed Feb. 14, 2023).

The facts of this case and circumstances of this defendant are dissimilar from those of *Harvel* and *Martinez*.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Court sentence the defendant to a term of no less than 41 years' imprisonment.

Dated:  October 11, 2023

Respectfully submitted,

| | |
|---|---|
| NATALIE K. WIGHT | KRISTEN CLARKE |
| United States Attorney | Assistant Attorney General |
| | |
| */s/ Gavin W. Bruce* | */s/  Cameron A. Bell* |
| GAVIN W. BRUCE | CAMERON A. BELL |
| Assistant United States Attorney | Trial Attorney |
| | Civil Rights Division |